1

2

3                    **UNITED STATES DISTRICT COURT**

4                        **DISTRICT OF OREGON**

5                        **PORTLAND DIVISION**

6

7    MARINA RODRIGUEZ,

8                    Plaintiff,              No. 12-cv-01223-HU

9    vs.

10   CENTRAL SCHOOL DISTRICT 13J,      **FINDINGS & RECOMMENDATIONS ON**

11   an Oregon Special District,      **MOTION FOR SUMMARY JUDGMENT**

12                    Defendant.

13                    _____

14

15

16   Jesse L. Burgess
     Burgess Law PC
17   312 N.W. 10th Avenue
     Suite 200
18   Portland, OR 97209

19        Attorney for Plaintiff

20

21

22   Benjamin R. Becker
     Haley E. Percell
23   Oregon School Boards Association
     1201 Court Street, N.E.
24   Suite 400
     P.O. Box 1068
25   Salem, OR 97301

26        Attorneys for Defendant

27

28

1 - FINDINGS AND RECOMMENDATIONS

1   HUBEL, Magistrate Judge:

2       The plaintiff Marina Rodriguez brings this action against

3   her employer, Central School District 13J (the "School"),

4   alleging employment discrimination, hostile work environment,

5   and intentional infliction of emotional distress ("IIED"). Dkt.

6   #31, Amended Complaint. Rodriguez alleges she was subjected to

7   repeated incidents of harassment, discriminatory statements, and

8   abusive treatment by Yvonne VanHorn, who also worked for the

9   School. Rodriguez claims she submitted written and verbal

10  complaints to the School regarding VanHorn's actions, but the

11  School failed to take reasonable steps to remedy the situation.

12  She further alleges she suffered severe emotional distress as a

13  result of VanHorn's and the School's actions, causing her to

14  lose "weeks of work as a result of anxiety and stress-related

15  problem[s]." *Id.*, ¶ 23. She claims that in November 2011, her

16  doctor "contacted the school and requested that VanHorn no

17  longer supervise [Rodriguez] because of the deleterious effects

18  it was having on her emotional and psychological health." *Id.*

19      In her Amended Complaint, Dkt. #31, Rodriguez asserts the

20  following six claims for relief: (1) impairment of her

21  employment contract rights on the basis of her race and

22  ethnicity, in violation of 42 U.S.C. § 1981; (2) unlawful racial

23  discrimination/ harassment in violation of ORS § 659A.030; (3)

24  hostile work environment due to her race and ethnicity, in

25  violation of 42 U.S.C. § 1981; (4) hostile work environment due

26  to her race and ethnicity under state law, citing ORS §

27  659A.030, *et seq.*; (5) hostile work environment due to her race

28  and ethnicity, in violation of Title VII of the Civil Rights

2 - FINDINGS AND RECOMMENDATIONS

1  Act, 42 U.S.C. § 2000e *et seq.*; and (6) IIED under state law.

2  She also seeks attorney's fees and costs pursuant to 42 U.S.C.

3  § 1988, ORS § 659.121, and other applicable state and federal

4  law.  Dkt. #31.

5      The matter currently before the court is the School's motion

6  for summary judgment.  Dkt. ##47-53.  Rodriguez opposes the

7  motion, Dkt. ##55-58, and the School has replied, Dkt. #62.  The

8  court heard oral argument on the motion on October 3, 2013.  The

9  undersigned submits the following findings and recommended

10  disposition of the motion pursuant to 28 U.S.C. § 636(b)(1)(B).

11

12              ***I.  GENERAL SUMMARY JUDGMENT STANDARDS***

13      Summary judgment should be granted "if the movant shows that

14  there is no genuine dispute as to any material fact and the

15  movant is entitled to judgment as a matter of law."  Fed. R.

16  Civ. P. 56(c)(2).  In considering a motion for summary judgment,

17  the court "must not weigh the evidence or determine the truth of

18  the matter but only determine whether there is a genuine issue

19  for trial." *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800

20  (9th Cir. 2002) (citing *Abdul-Jabbar v. General Motors Corp.*, 85

21  F.3d 407, 410 (9th Cir. 1996)).

22      The Ninth Circuit Court of Appeals has described "the

23  shifting burden of proof governing motions for summary judgment"

24  as follows:

25          The moving party initially bears the burden
            of proving the absence of a genuine issue of
26          material fact.  *Celotex Corp. v. Catrett*,
            477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.
27          Ed. 2d 265 (1986).  Where the non-moving
            party bears the burden of proof at trial,
28          the moving party need only prove that there

3 - FINDINGS AND RECOMMENDATIONS

is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S. Ct. 2548. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. *Id.* at 324, 106 S. Ct. 2548. This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 528 (1986). In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S. Ct. 2505.

*In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).

Notably, "[a]s a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Calif. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000). The *Chuang* court explained that this minimal evidence standard is due to the nature of employment cases, where "'the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by a factfinder, upon a full record.'" *Id.* (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)).

4 - FINDINGS AND RECOMMENDATIONS

1

## II.  *BACKGROUND FACTS*

The following facts are undisputed except where noted. Rodriguez "is a Mexican-American (Hispanic) woman[.]" Dkt. #31, ¶ 1.  She was hired by the School in about October 2008, and she works in the Talmadge Middle School kitchen in the position of "Cook II." Dkt. #31, ¶ 6; Dkt. #53, p. 6.  Rodriguez alleges that one of her supervisors was Yvonne VanHorn. Dkt. #31, ¶ 6. The School claims the only person who has ever been Rodriguez's supervisor is Michael Vetter, who "is the Food Services Director" for the School.  Dkt. #53, p. 6.  According to the School, VanHorn and another individual, Dennis Vandercreek, were Rodriguez's coworkers in the school kitchen from 2010 to 2012. *Id.*  Vandercreek was employed as a Cook II, the same job classification as Rodriguez's.  The School claims "VanHorn was the lead cook in the kitchen and directed its daily operation, but she did not have the authority to hire, fire, or discipline [Rodriguez]." *Id.*, pp. 6-7.

The School indicates that until March 30, 2011, Rodriguez "generally performed [her] duties in a desired manner." Dkt. #53, p. 7.  However, according to the School, "around March 30, 2011, VanHorn began noticing [Rodriguez's] failure to follow instructions, . . . both oral and written[.]" *Id.*  Van Horn "discussed these deficiencies with Vetter, [Rodriguez's] supervisor." *Id.*

On April 16, 2011, Rodriguez submitted a complaint form to the School, in which Rodriguez claimed she was being harassed by VanHorn.  Dkt. #31, ¶ 7; Dkt. #52-1 (Ex. 104).  On the

handwritten form, Rodriguez described the nature of her complaint as follows:

> Work harrassment [sic] at place of work by another co-worker Yvonne VanHorn. Constant yelling, humiliation, harrassment [sic], trying to control and hurr[y]ing me at work. I just feel that I am getting unfair treatment by her because of the way she acts and speaks to me. She constantly looks like she is always angry with me but I do not know why. . . . I want to be able to work in a non-stressful environment and be fairly treated. I also want this whole situation to be resolved.

Dkt. #52-1 (Ex. 104).

Rodriguez also submitted a longer, more detailed, typewritten narrative describing her complaint. She claimed VanHorn spoke to her rudely, disrespected her, and harassed her about her work. She claimed numerous other individuals, including coworkers and students, had witnessed VanHorn's treatment of her and had encouraged Rodriguez to report VanHorn's actions, but Rodriguez had not done so because she feared making the situation with VanHorn worse. Rodriguez claimed the stress from VanHorn's ongoing treatment of her was adversely affecting her health. Dkt. #52-2 (Ex. 105). On April 19, 2011, Carmen Carver, the School's Human Resources Coordinator, notified Rodriguez that the School would be investigating her complaint. Dkt. #52-3 (Ex. 106).

Among other things, Rodriguez claims VanHorn discriminated against her because although Rodriguez understands English well, she has some difficulties speaking and writing in English. She alleges VanHorn tried to make her answer the telephone in the kitchen, even though VanHorn knew Rodriguez had difficulty

6 - FINDINGS AND RECOMMENDATIONS

writing messages in English.  *See* Dkt. #52-2, p. 1.  An incident
occurred on or about April 22, 2011, when Rodriguez was speaking
Spanish with a temporary cook.  Rodriguez claims VanHorn told
the two, "in a raised and angry voice, that they were not
allowed to speak Spanish at work and they had to speak English.
This was communicated in a way that was offensive and derisive
of the Hispanics and Spanish speakers."  Dkt. #31, ¶ 10; *see*
Dkt. #53, p. 7.  Rodriguez complained to the School's H.R.
office on the same day, and Carver and Human Resources Director
Rich McFarland "told VanHorn she could not prohibit people from
speaking Spanish at work."  Dkt. #53, p. 7; Dkt. #31, ¶ 10.

As a result of Rodriguez's written complaint, a meeting took
place between Rodriguez, VanHorn, and Vetter.  According to
Rodriguez, VanHorn "admitted to the allegations that she had
yelled and been aggressive with [Rodriguez]," and "Vetter
suggested . . . that VanHorn and [Rodriguez] needed to
communicate better."  Dkt. #31, ¶ 8.  The School claims the
investigation into Rodriguez's complaint "did not reveal
unlawful discrimination, but it did reveal a pattern of
ineffective communication between [Rodriguez] and VanHorn."
Dkt. #53, p. 8.

Vetter claims one of the actions he took in response to
Rodriguez's complaint was issuance of "a set of goals [for
VanHorn] suggesting communication techniques."  Dkt. #49, ¶ 9
(citing Dkt. #49-4 (Ex. 128).  However, the cited Exhibit 128 to
Vetter's Declaration, entitled "Goals for Yvonne VanHorne
[sic]," is dated March 30, 2010, more than a year *before*
Rodriguez ever submitted a complaint regarding VanHorn.  The

7 - FINDINGS AND RECOMMENDATIONS

document describes VanHorn's strengths as a kitchen manager, and also lists two areas that needed improvement: (1) praising her staff in public, but disciplining them in private, noting "Discipline . . . done in public is doming [sic] and embarrassing"; and (2) communicating more effectively with customers of the cafeteria, without exhibiting frustration with them. *See id.*

Vetter wrote Rodriguez a letter dated May 9, 2011, in which he indicated the food service staff was expected to have a meeting at least once a week, at the end of the workday, "to go over the day from what went well and things that need more improvement." Dkt. #52-4. He advised Rodriguez "to speak up" when she was unclear about directions or procedures, in order to help allay Rodriguez's "feeling of being worried in making mistakes." *Id.* Vetter acknowledged that mistakes would "happen by everyone so we need to work together to help learn from our mistakes and try to improve." *Id.* He also asked Rodriguez to "write down [her] daily duties to help ensure [her] understanding of the complete duties of the day." *Id.* Vetter promised to followup with Rodriguez regarding the matter. *Id.*

Vetter wrote another letter to Rodriguez, dated May 19, 2011, to advise her of the results of his investigation into Rodriguez's complaint. Vetter indicated he had met with the kitchen staff, and he and Carver had "spoke[n] separately to Dennis Vandercreek, Yvonne VanHorn and [Rodriguez]." Dkt. #49-1 (Ex. 110). Vetter stated his investigation into Rodriguez's concerns had revealed that "the working environment [to

8 - FINDINGS AND RECOMMENDATIONS

Rodriguez] was not as welcoming as it was in the past and that some of the existing procedures create[d] communication barriers[.]" *Id.* He stated he would be working with the entire kitchen staff to improve their "team approach and attitude." *Id.* Vetter indicated Rodriguez and VanHorn "were in agreement about wanting to continue working together," and "both felt this could be resolved with better communication and team building." *Id.*

The School claims Rodriguez did not raise any further concerns about VanHorn "until November 14, 2011." Dkt. #53, p. 8 (citing Dkt. #49, Vetter Decl., ¶ 9). In her Amended Complaint, Rodriguez describes eight incidents during October and November 2011, when VanHorn allegedly harassed her and treated her with disdain, derision, rudeness, and lack of respect. Dkt. #31, ¶¶ 11-18. On one occasion, she claims VanHorn actually "threw baking sheets and cookware" at her, frightening Rodriguez and causing her "to feel threatened at work." *Id.*, ¶ 13.

One incident of note involved the serving of tater tots to students. Rodriguez states that in early October 2011, a new policy was instituted "that children were not to be fed tater tots at breakfast." *Id.*, ¶ 16. Rodriguez claims she forgot about the new policy, and "began to open bags of tater tots and prepar[e] them to be cooked. She asked VanHorn if she should cook them. Van Horn directed her to a posted memorandum, which stated that she should not." *Id.* Rodriguez alleges VanHorn then "lied to her supervisor and made a complaint saying that [Rodriguez] had cooked and served the tater tots." *Id.*

9 - FINDINGS AND RECOMMENDATIONS

On November 2, 2011, Vetter issued a Classified Employee Warning Notice to Rodriguez for unsatisfactory work. Vetter described the "Statement of Problem" as follows:

> On 10/04/11 Yvonne VanHorn was conducting a weekly employee meeting with Marina Rodriguez and Dennis Vandercreek. During the meeting Yvonne was talking about not using Tator [sic] Tots during breakfast anymore. She went over other information and had both staff members sign the meeting notes to make sure they understood what was said. The following day on 10/5/11 Marina [Rodriguez] began . . . again to use Tator [sic] Tots for breakfast even though they had the meeting the previous day. Other instances have occurred with similar errors and have become a repeated problem. On a letter dated May 9th, 2010 I asked you to speak up when you don't understand directions. In addition[,] in an interview[,] . . . Dennis Vandercreek[,] a fellow employee[,] said "that Marina often asks him repeatedly what to do even when her duties are already written down. This is a resent [sic] problem and he found it difficult to understand considering that she has been doing her job for several years. He summed up all of the problems with a lack of proper communication and understanding of the directives."

Dkt. #49-2 (Ex. 111), p. 1. Vetter stated Rodriguez was "expected to follow all guidance from her lead cook IV," and she was "expected to be able to understand all guidance and when [she] doesn't then she must ask for clarification. Improving upon the English language could also be a big help for her." *Id.* Vetter indicated if Rodriguez did not demonstrate "improvement in this area," she could be subject to "further discipline up to and possibly including termination of [her] employment." *Id.*, p. 2. He indicated a followup meeting would occur on November 10, 2011. Rodriguez signed the notice to

10 - FINDINGS AND RECOMMENDATIONS

1    indicate she had discussed it with Vetter. *Id.* Vetter also
2    claims he asked Rodriguez "to submit a written statement
3    explaining how she could improve her work performance and
4    improve communication with VanHorn." Dkt. #53, p. 9 (citing
5    Dkt. #49, ¶ 11); *cf.* Dkt. #31, ¶ 21.   However, the followup
6    meeting never took place, and Rodriguez never submitted the
7    written statement, because, on November 9, 2011, Rodriguez
8    "requested leave for a stress related injury." Dkt. #53, p. 9.

9        On November 13, 2011, Rodriguez submitted a written
10   complaint alleging ongoing harassment, discrimination,
11   retaliation, and hostile work environment by VanHorn.  She
12   claimed VanHorn continued to engage in "yelling, humiliation and
13   false statements against [Rodriguez]," and she stated
14   "investigation is needed." Dkt. #52-5. As before, Rodriguez
15   also prepared a detailed, typewritten narrative of her
16   allegations. Dkt. #52-6. She related several incidents that
17   occurred from September through early November 2011, stating
18   that due to VanHorn's ongoing treatment of her, Rodriguez had
19   sought medical treatment and had even been hospitalized "for
20   situational stress and extreme anxiety." *Id.*, p. 3. She urged
21   the School to "take this matter seriously and [conduct] a deep
22   investigation." *Id.*

23       On November 30, 2011, H.R. Director Rich McFarland wrote
24   Rodriguez a letter in response to her complaint.  McFarland
25   indicated a meeting had been held on November 21, 2011,
26   involving Rodriguez, two union representations, Carver, and a
27   "Translator," for the purpose of allowing Rodriguez "to express
28   [her] concerns verbally and share any additional information

11 - FINDINGS AND RECOMMENDATIONS

which [she] felt might be helpful in the District's internal investigation." Dkt. #52-7. McFarland indicated he would be investigating Rodriguez's complaint as "a neutral third party in the matter." *Id.*

McFarland wrote to Rodriguez on December 14, 2011, to report on his investigation and findings. McFarland indicated he had "found no illegal discrimination against [Rodriguez] from Yvonne VanHorn," and he found VanHorn had not singled Rodriguez out or treated her "in a discriminatory manner" based on Rodriguez's race, color, religion, national origin, genetic information, or sex. Dkt. #50-1, p. 1. McFarland further "did not find any violation specific to harassment in the work place resulting in a hostile work environment." *Id.*, p. 2. McFarland found that a "personality conflict[]" existed that would prevent Rodriguez and VanHorn from working well together. Therefore, he indicated Rodriguez would remain at Talmadge, while "other individuals" would be transferred. *Id.* It appears VanHorn was transferred to another school, and later quit her job. Dkt. ##52-8, 52-9, p. 2.

Rodriguez filed a formal complaint with the Oregon Bureau of Labor and Industry ("BOLI"), and received a right-to-sue letter from the agency. *See* Dkt. #31, ¶ 5. A BOLI investigator noted Rodriguez, "oddly," had stated VanHorn treated everyone badly, not just Rodriguez, and this even included students at the school. Rodriguez stated students "were afraid of [VanHorn], because of the way she treated them and other staff." Dkt. #52-9, p. 3; *see* Dkt. #57, Decl. of Marina Rodriguez, ¶ 10 (indicating VanHorn "was generally difficult with other

12 - FINDINGS AND RECOMMENDATIONS

employees and other students," making children cry and causing others not to want to work around her).

Rodriguez apparently filed a worker's compensation claim relating to her stress and anxiety. Rodriguez reported to the BOLI investigator that her worker's compensation claim "was accepted." *Id.*, p. 2.

Rodriguez continues to work at Talmadge. According to Rodriguez, she gets along well with her current supervisor, "Sally," but Rodriguez admitted that sometimes Sally and Vetter "have difficulty understanding her English." *Id.*, p. 3. Rodriguez indicated she is "taking classes to improve her skills with the English language." *Id.* Rodriguez claims that since VanHorn was transferred, Rodriguez's work environment has "improved drastically," her "mental and physical health [have] returned to near normal," and she has not received any complaints about her work performance. Dkt. #57, ¶ 35.

### III.  DISCUSSION

#### A.  Disparate Treatment Claims

In her First and Second Claims for Relief, Rodriguez claims she was subjected to disparate treatment on the basis of her race and ethnicity, under federal and state law. *See* Dkt. #31, ¶¶ 24-29 (First Claim for Relief, under 42 U.S.C. § 1981); ¶¶ 30-34 (Second Claim for Relief, under ORS § 659A.030). Employment actions brought under 42 U.S.C. § 1981 are analyzed under the standards of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* *Grimmett v. Knife River Corp.-Northwest*, No. 03:10-cv-241-HU, slip op., 2011 WL 841149, at *6

13 - FINDINGS AND RECOMMENDATIONS

1   (D. Or. Mar. 8, 2011) (Hubel, MJ) (citing *Manatt v. Bank of Am.,*
2   *N.A.*, 339 F.3d 792, 797 (9th Cir. 2003)).   The Oregon Court of
3   Appeals  has  explained  that  because  the  Oregon  statute  "was
4   modeled after Title VII, . . . federal cases interpreting Title
5   VII are instructive." *Harris v. Pameco Corp.*, 170 Or. App. 164,
6   176, 12 P.3d 524, 532 (2000) (citing *Mains v. Morrow, Inc.*, 128
7   Or. App. 625, 634, 877 P.2d 88, 93 (1994) (noting "Title VII was
8   the basis for ORS 659.030)); *see Henderson v. Jantzen, Inc.*, 79
9   Or.  App.  654,  657,  719  P.2d  1322,  1324  (1986)  (holding  a
10  plaintiff's burden to establish a *prima facie* case of disparate
11  treatment is subject to the same analysis under both federal and
12  state law).

13      "Title VII of the Civil Rights Act of 1964 makes it 'an
14  unlawful  employment  practice  for  an  employer  .  .  .  to
15  discriminate  against  any  individual  with  respect  to  his
16  compensation, terms, conditions, or privileges of employment,
17  because of such individual's race, color, religion, sex, or
18  national origin.'" *Harris v. Forklift Systems, Inc.*, 510 U.S.
19  17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (quoting
20  42  U.S.C.  §  2000e-2(a)(1)).    "A  person  suffers  disparate
21  treatment in his employment when he or she is singled out and
22  treated less favorably than others similarly situated on account
23  of race." *Cornwell v. Electra Central Credit Union*, 439 F.3d
24  1018, 1028 (9th Cir. 2006) (internal quotation marks, citations
25  omitted).

26      A disparate treatment plaintiff may defeat summary judgment
27  "by providing direct evidence of discrimination[,] or by relying
28  on  circumstantial  or  indirect  evidence  and  satisfying  the

14 - FINDINGS AND RECOMMENDATIONS

burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." *Grimmett*, 2011 WL 841149, at *6 (citing *Cornwell*, 439 F.3d at 1028-30). The Ninth Circuit has explained that direct evidence of discrimination consists of "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the *fact finder* to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004) (emphasis in original; internal quotation marks, citations omitted). The record does not present any direct evidence of discrimination. Rodriguez also has failed to show VanHorn was "involved in the decision-making process" at the School, or that anyone else who was "involved in the decision-making process" made statements or acted in a way that directly reflected a discriminatory attitude. As a result, the burden-shifting framework comes into play.

To establish a *prima facie* case of race discrimination under *McDonnell Douglas* and *Burdine*, Rodriguez must show that (1) she belongs to a racial minority; (2) she performed her job satis-factorily; (3) she suffered an "adverse employment action"; and (4) the School treated her differently than a similarly-situated employee who does not belong to the same protected class. *See Cornwell*, 439 F.3d at 1028 (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824). If she meets these criteria, then

a presumption exists that the School "undertook the challenged employment action because of [Rodriguez's] race." *Id.* The School can rebut this presumption by producing "admissible evidence showing that the [School] undertook the challenged employment action for a 'legitimate, nondiscriminatory reason.'" *Id.* If the School does so, then the presumption is rebutted, and Rodriguez "may defeat summary judgment by satisfying the usual standard of proof required in civil cases under Fed. R. Civ. P. 56(c)." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000)). The *Cornwell* court explained that, "[i]n the context of employment discrimination law under Title VII, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's race." *Id.* (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 886, 889 (9th Cir. 1994)).

To defeat an employer's proffer of a "legitimate, nondiscriminatory reason" for its actions, a plaintiff "may offer evidence . . . "that the employer's legitimate, non-discriminatory reason is actually a pretext for racial discrimi-nation." *Id.* (footnote, additional citations omitted). Evidence of pretext may be circumstantial so long as it is "specific" and "substantial" enough to create a genuine issue of material fact. *Id.*, 439 F.3d at 1029 (footnote, citation omitted).

The School argues Rodriguez has failed to meet the third and fourth elements of the *McDonnell Douglas* test to establish a

16 - FINDINGS AND RECOMMENDATIONS

1   *prima facie* case. Dkt. #53, pp. 16-21.  The School also argues

2   Rodriguez has failed to show any "discriminatory intent" on the

3   School's part, citing the undersigned's observation that the

4   "'central element' of a disparate treatment claim is

5   'discriminatory intent.'"  *Id.*, p. 21 (quoting Dkt. #26, pp. 11-

6   12, in turn quoting *Ledbetter v. Goodyear Tire & Rubber Co.*, 550

7   U.S. 618, 624, 127 S. Ct. 2162, 2167, 167 L. Ed. 2d 982 (2007)).

8       There is no question that Rodriguez is a member of a racial

9   minority protected under Title VII, satisfying the first element

10  of a *prima facie* case.  Rodriguez has raised a sufficient

11  question of fact regarding her job performance to satisfy the

12  second element. Regarding the third element, Rodriguez argues

13  the "adverse employment action" in question consists of two

14  adverse job evaluations, plus frequent changes to her job

15  duties, all allegedly due to VanHorn's "fabricated stories" and

16  harassment. Dkt. #55, pp. 18-19.

17      Courts often are faced with the question of what constitutes

18  an "adverse employment action" for purposes of Title VII claims.

19  As Chief Judge Aiken of this court recently observed:

20           The Ninth Circuit has held that "not
21       every employment decision amounts to an
         adverse employment action," further stating
22       that "only non-trivial employment actions
         that would deter reasonable employees from
23       complaining about Title VII violations" are
         actionable.  *Brooks v. City of San Mateo*,
24       229 F.3d 917, 928 (9th Cir. 2000).  Thus, an
         adverse employment action is any action that
25       is "reasonably likely to deter employees
         from engaging in protected activity."  *Ray*
26       *v. Henderson*, 217 F.3d 1234, 1243 (9th Cir.
         2000).  A variety of actions have met this
27       definition, including: termination, negative
         employment references, undeserved negative
28       performance reviews, and failure to be

17 - FINDINGS AND RECOMMENDATIONS

                    promoted or to be considered for promotions.
                    *Brooks*, 214 F.3d at 1093.

*deBarros v. Wal-Mart Stores, Inc.*, slip op., 2013 WL 3199670, at
*6 (D. Or. June 19, 2013) (Aiken, CJ).

        Rodriguez alleges both of her adverse job evaluations
occurred as a result of her discrimination complaints against
VanHorn, and therefore they were adverse employment actions for
purposes of her disparate treatment claim.  Rodriguez cites
*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S.
53, 57, 126 S. Ct. 2405, 2409, 165 L. Ed. 2d 345 (2006), in
which she claims the Supreme Court "recently held that adverse
employment actions are 'employer actions that would have been
materially adverse to a reasonable employee.'"  Dkt. #55, p. 17
(quoting *Burlington*, *supra*).  However, as I discussed in
*Grimmett*, "[t]he concept of 'adverse employment action' is more
broadly construed in the retaliation context than in the
substantive discrimination context in a disparate treatment
claim."  *Id.*, at *9 (citing *Burlington*, 548 U.S. at 60-63, 126
S. Ct. at 2410-12).  The language from the *Burlington* opinion
quoted by Rodriguez specifically related to Title VII's "anti-
retaliation provision," not to a disparate treatment claim.  *See*
*Burlington*, 548 U.S. at 57, 126 S. Ct. at 2409.

        In *Grimmett*, I held a warning letter that did not effect any
materially-adverse change in the employee's working conditions
was not an adverse employment action for purposes of a race
discrimination claim.  *See Grimmett*, 2011 WL 841149, at **9-10.
A similar conclusion is warranted here.  Rodriguez's negative
performance reviews did not effect any materially-adverse change

18 - FINDINGS AND RECOMMENDATIONS

in the terms and conditions of her employment.  Similarly, the alleged frequent changes in her job duties did not *materially change* the terms and conditions of her job.  Although the negative performance reviews, at least, might be construed as "adverse employment actions" for purposes of a Title VII retaliation claim, that is not what Rodriguez has pleaded here, nor is it likely she could show retaliation, given that she continues to hold the same position with the School, without demotion or other adverse consequence, nearly two years after she received the warning letters.

Accordingly, Rodriguez has failed to establish the third element of a *prima facie* case for disparate treatment.  As a result, the School's motion for summary judgment should be granted as to Rodriguez's First and Second Claims for Relief.  Because the court finds Rodriguez has failed to establish the third element of a *prima facie* case of disparate treatment, the court does not reach the parties' arguments regarding whether Rodriguez has established the fourth element of a *prima facie* case.

## B.  Hostile Work Environment Claims

Rodriguez asserts three hostile work environment claims: her Third Claim for Relief, under 42 U.S.C. § 1981, Dkt. #31, ¶¶ 35-41; her Fourth Claim for Relief, under ORS § 659A.030 *et seq.*, Dkt. #31, ¶¶ 42-48; and her Fifth Claim for Relief, under 42 U.S.C. § 2000e, Dkt. #31, ¶¶ 49-55.  Other than citing different statutes as a basis for relief, her three hostile work environment claim are identical.

1    Preliminarily, the court finds Rodriguez's Third and Fifth
2    Claims for Relief are redundant.   Hostile work environment
3    claims in the Ninth Circuit "are cognizable under § 1981."
4    *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122
5    (2008) (citing *Manatt*, 339 F.3d at 797).   A hostile work
6    environment claim contains the same elements and is governed by
7    the same legal principles whether the claim is brought under
8    section 1981 or Title VII.   *Id.* at n.3 .   As such, Rodriguez's
9    Third and Fifth Claims for Relief should be combined into a
10   single claim.

11   To prevail on a hostile work environment claim, Rodriguez
12   "must show that the work environment was so pervaded by
13   discrimination that the terms and conditions of employment were
14   altered." *Vance v. Ball State Univ.*, ___ U.S. ___, ___, 133 S.
15   Ct. 2434, 2441, 186 L. Ed. 2d 565 (June 24, 2013) (citations
16   omitted). Actionable conduct must be severe or pervasive enough
17   that not only Rodriguez, but other reasonable persons would find
18   it hostile or abusive.   *See Harris v. Forklift Sys., Inc.*, 510
19   U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993).   The
20   Ninth Circuit has explained the elements of a hostile work
21   environment claim, as follows:

22   　　　　To establish a *prima facie* case for a
     　　　　hostile-work environment claim, [the
23   　　　　plaintiff] must raise a triable issue of
     　　　　fact as to whether (1) the defendants
24   　　　　subjected her to verbal or physical conduct
     　　　　based on her race; (2) the conduct was
25   　　　　unwelcome; and (3) the conduct was
     　　　　sufficiently severe or pervasive to alter
26   　　　　the conditions of her employment and create
     　　　　an abusive working environment.
27
28

*Surrell v. Calif. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008) (citing *Manatt*, 339 F.3d at 798).

The determination of "whether an environment is 'hostile' or 'abusive' can only be determined by looking at all the circumstances." *Best v. California Dept. of Corrections*, 21 Fed. Appx. 553, 556 (9th Cir. 2001). The *Best* court explained further:

> "These [circumstances] may include the fre-
> quency of the discriminatory conduct; its
> severity; whether it is physically
> threatening or humiliating, or a mere
> offensive utterance; and whether it
> unreasonably interferes with an employee's
> work performance." *Harris* [*v. Forklift
> Sys., Inc.*], 510 U.S. [17,] 23[, 114 S. Ct.
> 367, 371, 126 L. Ed. 2d 295 (1993)]. Simple
> teasing, offhand comments, and isolated
> incidents (unless extremely serious) do not
> amount to discriminatory changes in the
> terms and conditions of employment.
> *Faragher v. City of Boca Raton*, 524 U.S.
> 775, 788, 118 S. Ct. 2275, [2283,] 141 L.
> Ed. 2d 662 (1998); *Steiner v. Showboat
> Operating Co.*, 25 F.3d 1459, 1463 (9th Cir.
> 1994). *Faragher* emphasized that "conduct
> must be extreme to amount to a change in the
> terms and conditions of employment." 524
> U.S. at 788[, 118 S. Ct. at 2283].

*Id.* Stated in simpler terms, although an isolated comment, even if offensive, is insufficient to create actionable harassment, "it is sufficient to show that the conduct 'pollute[d] the [plaintiff's] workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position.'" *Mousleh v. Gladstone Auto, LLC*, 2012 WL 2574812, at *6 (D. Or. July 3, 2012) (Hernandez, J) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004) (internal quotation marks, citations omitted).

1    In her Amended Complaint, Rodriguez has made the following

2 allegations that could, in context, be deemed to allege discrim-

3 inatory treatment based on Rodriguez's race or ethnicity:

4          Plaintiff is a Mexican-American (Hispanic)
           woman. . . . Dkt. #31, ¶ 1.
5
           In response to Rodriguez's April 2011
6          harassment complaint against VanHorn, a
           meeting was held at which "Vetter suggested
7          . . . that VanHorn and [Rodriguez] needed to
           communicate better." *Id.*, ¶ 8.
8
           "On or about 22 April 2011, VanHorn told
9          [Rodriguez] and Rosa Vargas, another
           Hispanic employee, in a raised and angry
10         voice, that they were not allowed to speak
           Spanish at work and they had to speak
11         English.  This was communicated in a way
           that was offensive and derisive of the
12         Hispanics and Spanish speakers." *Id.*, ¶ 10.

13         "On or around 10 October 2011, VanHorn asked
           to have another person interpret [Rodriguez]
14         from Spanish because [Rodriguez] refused to
           speak in English with her.  When [Rodriguez]
15         did not understand something that was said
           [VanHorn] yelled at [Rodriguez] and refused
16         to repeat herself." *Id.*, ¶ 17.

17         "VanHorn did not subject white employees to
           the same discriminatory and harassing
18         behavior as the Hispanic employees." *Id.*, ¶
           22.
19
The allegations in paragraphs 1, 8, and 10 of Rodriguez's
20
Amended Complaint are substantially similar to her allegations
21
in paragraphs 1, 6, and 15 of her original Complaint. *See* Dkt.
22
#1.
23
     In the undersigned's Findings and Recommendations on the
24
School's motion to dismiss Rodriguez's original Complaint, I
25
quoted paragraphs 8 and 15 of the Complaint, and found as
26
follows:
27
           Thus, Rodriguez alleges that on two
28         occasions, nearly six months apart, one

22 - FINDINGS AND RECOMMENDATIONS

> coworker acted in a way Rodriguez deemed to
> be "derisive of the Spanish language and
> Spanish speakers, generally." These
> incidents do not rise to the level of
> "pervasive and severe" conduct required to
> state a claim for hostile work environment.
> Further, Rodriguez has failed to allege
> facts indicating Van Horn's other actions
> toward her, although allegedly offensive and
> rude, were motivated by Rodriguez's race.

Dkt. #26, pp. 15-16. The School argues Rodriguez's Amended Complaint does not vary materially from her original Complaint, and because the court dismissed her original Complaint for failure to state a claim, the School is entitled to summary judgment on Rodriguez's Amended Complaint.

However, the standards for motions to dismiss and for summary judgment differ. On a motion to dismiss, the court tests the sufficiency of the pleading. Except in limited circumstances, the court looks only at the allegations in the Complaint, taking the factual allegations as true and construing the Complaint in the plaintiff's favor. *See Gambee*, 2011 WL 1311782, at *2 (citing *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)). In contrast, on a motion for summary judgment, the court considers the evidence submitted by the parties to determine whether a genuine issue of material fact exists that must be resolved at trial. *In re Oracle Corp. Securities Litigation*, 627 F.3d at 387.

In Rodriguez's Declaration and in her deposition testimony, she alleges VanHorn treated white employees in a friendly and cordial manner, while treating non-white employees less favorably. She claims VanHorn yelled at her regularly, humiliating her in front of others. She further claims that

23 - FINDINGS AND RECOMMENDATIONS

after she made a discrimination complaint against VanHorn, VanHorn's abusive treatment of her escalated. Considering the minimal evidence required to overcome summary judgment in an employment case, *see Chuang*, 225 F.3d at 1124, and viewing the facts in the light most favorable to Rodriguez, the court finds she has raised triable questions of fact as to whether VanHorn's conduct was racially-motivated, and was sufficiently pervasive to create a hostile work environment. As such, the School's motion for summary judgment on Rodriguez's hostile work environment claims should be denied.

## C. *Intentional Infliction of Emotional Distress ("IIED") Claim*

In *Mayorga v. Costco Wholesale Corp.*, the Ninth Circuit Court of Appeals, applying Oregon law, observed:

> To succeed on a claim for intentional infliction of emotional distress, a plaintiff must prove: "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 321 Or. 532, 901 P.2d 841, 849 (1995) (internal quotation marks and citation omitted).

*Mayorga*, 302 Fed. Appx. 748, 749 (9th Cir. 2008); *accord Grimmett; see House v. Hicks*, 218 Or. App. 348, 357-58, 179 P.3d 730, 736 (2008) (IIED plaintiff must prove that defendant "intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such

24 - FINDINGS AND RECOMMENDATIONS

distress"; that defendant's conduct was "outrageous . . . *i.e.*,
conduct extraordinarily beyond the bounds of socially tolerable
behavior"; and that defendant's "conduct in fact caused
plaintiff severe emotional distress") (citation omitted). "'A
trial court plays a gatekeeper role in evaluating the viability
of an IIED claim by assessing the allegedly tortious conduct to
determine whether it goes beyond the farthest reaches of
socially tolerable behavior and creates a jury question on
liability.'" *Ballard v. Tri-County Metro. Transp. Dist. of
Oregon*, No. 09-873, slip op., 2011 WL 1337090 (D. Or. Apr. 7,
2011) (Papak, MJ) (quoting *House*, 218 Or. App. at 358, 179 P.3d
at 736; and citing *Pakos v. Clark*, 253 Or. 113, 453 P.2d 682,
691 (1969) "('It was for the trial court to determine, in the
first instance, whether the defendants' conduct may reasonably
be regarded as so extreme and outrageous as to permit
recovery.')").

    For conduct to be sufficiently "extreme and outrageous" to
support a claim for IIED, the conduct must be "'so outrageous in
character, and so extreme in degree, as to go beyond all
possible bounds of decency, and to be regarded as atrocious, and
utterly intolerable in a civilized community.'" *House*, 218 Or.
App. at 358-60, 179 P.3d at 737-39 (quoting *Restatement (Second)
of Torts*, § 46, comment d).  The determination of whether
conduct rises to this level "is a fact-specific inquiry, to be
considered on a case-by-case basis, based on the totality of the
circumstances." *Id.* However, although the inquiry is fact-
specific, the question of whether the defendant's conduct
exceeded "the farthest reaches of socially tolerable behavior"

25 - FINDINGS AND RECOMMENDATIONS

is, initially, "a question of law." *Houston v. County of Wash.*, 2008 WL 474380, at *15 (D. Or. Feb. 19, 2008) (citation omitted).

The relationship between the parties is important in evaluating the allegedly distressing conduct. For example, "[t]he existence of the employee-employer relationship constitutes a 'special relationship' that may be considered in determining whether the conduct is 'extraordinary[.]'" *Dolman v. Willamette Univ.*, No. CV-00-61, 2001 WL 34043744, at *16 (D. Or. Apr. 18, 2001) (Hubel, MJ) (citing *MacCrone v. Edwards Center, Inc.*, 160 Or. App. 91, 100, 980 P.2d 1156, 1162 (1999)). Indeed, the Oregon Court of Appeals has identified the existence of a "special relationship, . . . such as employer-employee," as *the most important* factor in examining the conduct. *House*, 218 Or. App. at 360, 179 P.3d at 737. Nevertheless, "[c]onduct that is merely 'rude, boorish, tyrannical, churlish and mean' does not satisfy the standard, . . . nor do 'insults, harsh or intimidating words, or rude behavior ordinarily . . . result in liability even when intended to cause distress.'" *Watte v. Edgar Maeyens, Jr., M.D., P.C.*, 112 Or. App. 234, 238, 828 P.2d 479, 481 (1992) (citations omitted).

The School argues Rodriguez has failed to allege facts that even begin to rise to the level of socially-intolerable behavior required to sustain an IIED claim. The School further argues summary judgment is warranted because Rodriguez has relied solely on the allegations in her Amended Complaint, which the School argues "allege unsupported conjecture and conclusory statements." Dkt. #53, p. 16; *see id.*, pp. 11-16.

Rodriguez argues she "does not rely solely upon the allegations in her [amended] complaint." Dkt. #55, p. 27. She claims evidence developed during discovery supports her IIED claim. She offers her Declaration, and the transcript of her deposition testimony, in which she described her treatment by VanHorn and its resulting effects on her. Among other things, Rodriguez notes that when she saw a doctor for stress on November 9, 2011, her doctor called an ambulance and had Rodriguez transported to a hospital, where she remained for two days. Rodriguez claims that "[a]s a result of the stress, [she] was unable to return to work until January 2012." Dkt. #57, p. 6. In her response to the School's motion, Rodriguez argues that in the context of an employer-employee relationship, VanHorn's alleged conduct was sufficiently outrageous to overcome summary judgment on her IIED claim. Dkt. #55, pp. 27-29.

Even if VanHorn acted intentionally, and her conduct caused Rodriguez to suffer extreme stress, the standard is not the *effects* of the conduct, but the conduct itself. "The key focus in IIED cases is not on the result, but on the purpose and the means used to achieve it." *Meagher v. Lamb-Weston, Inc.*, 839 F. Supp. 1403, 1409 (D. Or. 1993) (Panner, J) (citation omitted). Although VanHorn's behavior toward Rodriguez may have been distasteful and inappropriate, it was not sufficiently egregious to result in liability for IIED. *See, e.g.*, *Pearson v. U.S. Bank Corp.*, No. 04-3026, 2004 WL 1857099 (D. Or. Aug. 18, 2004) (Cooney, MJ) (presenting plaintiff with toilet in front of other managers and co-workers, falsely accusing plaintiff of dishonesty, and making unfounded accusations against plaintiff

for unsatisfactory work performance held not to "rise to the requisite level of extreme conduct which the courts have found exceeds the bounds of social toleration"); *Clemente v. State*, 227 Or. App. 434, 443, 206 P.3d 249, 255 (2009) (affirming dismissal of IIED claim, noting: "At most, [plaintiff] was subjected to an insensitive, mean-spirited supervisor who might have engaged in gender-based, discriminatory treatment, but . . . that treatment by itself did not amount to '*aggravated* acts of *persecution* that a jury could find beyond all tolerable bounds of civilized behavior.'") (emphasis in original; quoting *Hall v. The May Dept. Stores*, 292 Or. 131, 139, 637 P.2d 126, 131 (1981)); *Hetfeld v Bostwick*, 136 Or. App. 305, 901 P.2d 986 (1995) (no claim for IIED where defendant-mother and her new husband engaged in course of conduct designed to cause estrangement of plaintiff-father from his children); *Shay v. Paulson*, 131 Or. App. 270, 884 P.2d 870 (1994) (no claim for IIED where defendant allegedly forged plaintiff's name on magazine order form); *Watte v. Edgar Maeyens, Jr., M.D., P.C.*, 112 Or. App. 234, 828 P.2d 479 (1992) (in the course of terminating plaintiffs, defendant allegedly directed them to hold hands with two co-workers, demanded surrender of their keys, "paced tensely in front of them with clenched hands, accused them of being liars and saboteurs, . . . and rashly ordered them off the premises"; conduct found not to exceed bounds of social toleration).

I recommend the School's motion for summary judgment be granted on Rodriguez's Sixth Claim for Relief for IIED, because

the alleged conduct does not constitute an extraordinary transgression of the bounds of socially-tolerable conduct.

### IV.  CONCLUSION

In summary, the undersigned recommends the School's motion for summary judgment be granted as to Rodriguez's First, Second, and Sixth Claims for Relief; and denied as to her Third, Fourth, and Fifth Claims for Relief, although I further recommend her Third and Fifth Claims for Relief be considered as a single claim.

/ / /

/ / /

/ / /

### V.  SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due by **October 22, 2013.**  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.   If objections are filed, then any response is due by **November 8, 2013.**  By the earlier of the response due date or the date a

1  response is filed, the Findings and Recommendations will go

2  under advisement.

3      IT IS SO ORDERED.

4                          Dated this 4th day of October, 2013.

5

6                          /s/ Dennis J. Hubel

7                          _____

8                          Dennis James Hubel
                           Unites States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30 - FINDINGS AND RECOMMENDATIONS